# Richmond

IRA E. STUTZMAN, ET AL. V. C. A. NASH & SON, INC.

April 25, 1949.

Record No. 3474.

Present, All the Justices.

The opinion states the case.

*Louis Lee Guy*, for the appellants.

*Williams, Cocke & Tunstall*, for the appellee.

SPRATLEY, J., delivered the opinion of the court.

In the year, 1936, Ira E. Stutzman, long engaged in the work of cleaning wooden floors, developed a formula consisting of a combination of several ingredients, which added together and diluted with water in the proportions of sixteen parts water to one part of a soap compound made what was. claimed to be an excellent floor cleaning fluid. Desirous of placing the cleaner on the market, he sought to have C. A. Nash & Son, Inc., a wholesale merchant of paints, varnishes, floor cleaners, and similar articles, become its distributor to the retail trade. He induced the corporation to purchase five gallons of the fluid for use in experimental purposes to determine if there was any sales outlet for it. The corporation further purchased ten gallons in 1937, and fifty gallons in 1938. As a result of the experiment, William H. Nash, president of C. A. Nash & Son, Inc., on behalf of the corporation, in February, 1939, drafted and presented to Stutzman a contract dealing with the distribution of the latter's product. The contract, in the form of a letter, was duly accepted and executed by the complainant and his wife, Mrs. Bertha L. Stutzman. It reads as follows:

"Mr. I. E. Stutzman,
831 W. 36th St.,
Norfolk, Va.

"Dear Mr. Stutzman:

"For and in consideration of One Dollar ($1.00), the receipt of which is hereby acknowledged by your signature, and as a further consideration of our agreement to sell and further the sale of your 16-to-1 Cleaner, it is understood that we are to have the exclusive sale of this Cleaner on the following basis:

"We are to be your sole distributors through our agents, salesmen, etc.

"ADVERTISING: We are to spend not less than $50.-00 per year for advertising.

"PRICES: Your prices to us are to be as follows:

5-Gal. cans ............... per Gal. net—$1.25
55-Gal. Drums ............. per Gal. net— 1.10

"It is understood and agreed that you, the seller of the 16-to-1 Cleaner, will supply material to us, to be transferred to our containers; i. e., you, the seller, will not be put to container expense. It is further understood that we, the buyer, are to purchase not less than 50 gals. 16-to-1 Cleaner per year.

"FORMULA: In the event of your death or incapacity to the extent that you cannot manufacture this material, it is further agreed by you that without further cost the formula will be given to us, we to manufacture the Cleaner and pay Mrs. Stutzman, or your assigns, a royalty of 25¢ per gallon.

"This agreement made in triplicate on the 23rd day of February, 1939.

"Witness the following seals and signatures:

"C. A. NASH & SON, INC.,
"WM. HERBERT NASH, PRES. (Seal)
"Accepted by: IRA E. STUTZMAN (Seal)
"Accepted by: BERTHA L. STUTZMAN (Seal)"

During 1939, 1940, 1941, and 1942, approximately three hundred gallons of the fluid were delivered to the corporation by Stutzman. No delivery was made from December 19, 1942, to March 29, 1943. On the last date Stutzman made his last delivery amounting to eight gallons. On the grounds that deliveries were unsatisfactory and that a change had been made by Stutzman in the original ingredients of the fluid, the corporation began to purchase a floor cleaner fluid from other sources beginning on April 1, 1943.

The parties hereto will be hereinafter referred to as follows: Ira E. Stutzman as Stutzman, William H. Nash as Nash, and C. A. Nash & Son, Inc., as the corporation.

In September, 1945, this proceeding was brought by Stutzman and Bertha L. Stutzman, his wife, against the cor-

poration, for an alleged breach of the contract of February 23, 1939, and damages for lost profits. Their bill of complaint is based on two alleged agreements between the corporation and the complainants. The bill alleged that Stutzman, under an oral agreement, was the owner of the floor cleaner preparation and its tradename "16-to-1"; that the control, ownership and rights in connection with the preparation and sale of complainants' floor cleaner under its trade name were valuable assets; that, under the written contract, Stutzman had retained in himself the exclusive right to manufacture the preparation, granting to the corporation exclusive right to sell it to the public; that the corporation, in violation of the written contract, had been procuring its supply of the cleaner fluid from sources other than the complainants and was selling it under the trade name of "16-to-1", although complainants were, at all times, ready, willing and able to fulfill the terms of the contract, thereby depriving complainants of an estimated profit of sixty cents upon each gallon sold by the corporation. It prayed for specific performance, an accounting of profits, and injunctive relief.

The corporation answered, denying all of the material allegations of the bill, and specifically any breach of the provisions of its contract. It averred that the complainants had failed to carry out their obligations under the written contract to furnish it with sufficient cleaner fluid to supply the demands of the trade which it had built up by the expenditure of thousands of dollars in advertising; that, in effect, complainants had abandoned the manufacture of the preparation with its original ingredients; and that it had become necessary for it to secure a supply of a cleaner fluid from other sources. It further averred that the trade-mark under which it was sold belonged to it, and denied that the complainants were entitled to damages by way of profits on materials sold, or by way of royalties, or entitled to specific performance or injunctive relief.

After consideration of the pleadings, the depositions, and the argument, the trial court, on March 1, 1948, held that

the complainants were not entitled to relief prayed for in their bill, and dismissed the suit.

The evidence, taken by depositions, was sharply conflicting and contradictory. The judgment of the chancellor, under the circumstances, is presumed to be correct and stands until error has been pointed out. *Lavenstein* v. *Plumber*, 179 Va. 469, 471, 19 S. E. (2d) 696. It cannot be disturbed if it is reasonably supported by substantial, competent and credible evidence. *Ashby* v. *Dumouchelle*, 185 Va. 724, 731, 40 S. E. (2d) 493, and cases cited.

A summary of the essential portions of the evidence shows the following:

Stutzman testified that prior to his negotiations with the corporation, he had used the name "16-to-1" in describing his product because of the proportions of its components; that he told Mr. W. H. Nash in the negotiations leading up to the contract that he intended to have the fluid registered in his name under the trade-mark "16-to-1", and that Nash replied, "Let me do it for you. I have a lawyer I hire by the year and it will not cost you as much"; and that he agreed in order to save the lawyer's fees, and thought that registration had been made in his name prior to 1943.

Stutzman further said that he had been, at all times, ready and willing to fulfill the terms of the contract; that there had been no time at which he had been unable to fill orders if they had been received; and that when he learned early in 1943 that the corporation was purchasing a cleaner from other sources, which it was distributing under the trade-mark "16-to-1", he saw Nash and made a protest about not getting any orders. He admitted that during the years 1937-1942, he was following his trade as a floor cleaner and did not give his full time to the manufacture of the cleaner fluid. In 1943-1945, he was employed at the Naval Base, Norfolk, Virginia.

Stutzman did not, at any time, disclose to Nash or to the corporation the peculiar ingredients of his formula, nor did he ever demand, prior to this suit, the payment of any royalty.

Nash denied that Stutzman ever suggested that his product be called "16-to-1". He said that he did not tell Stutzman that he hired a lawyer by the year, and that he would have the trade-mark registered in the latter's name. He declared that, being trade-mark conscious, having registered a large number of trade-marks for his corporation, when Stutzman informed him it was a preparation of "sixteen parts water to one part of cleaner," he immediately saw the attractive sales feature of a 16 to 1 brand, connecting it with the William Jennings Bryan slogan "16 to 1 Free Silver;" and that he then told Stutzman that his corporation would give it the tradename "16 to 1". He said that as far as he knew he was the first person to call the product "16 to 1". In fact, the trade-mark "16 to 1", covering a floor cleaning compound composed of "abrasive, detergent and polishing materials," was registered in the United States Patent Office on January 26, 1943, in the office of the Secretary of the Commonwealth of Virginia on November 23, 1944, and in the office of the Secretary of the State of North Carolina on March 24, 1944, in the name and as the property of C. A. Nash & Son, Inc.

Nash testified that he made every effort to induce the public to purchase the cleaner manufactured by Stutzman; that he advertised it extensively and at a great cost, creating a considerable demand for it; that in October, 1942, Stutzman had gotten behind in his delivery of orders from the corporation; that, in fact, he was unable to deliver any cleaner from December, 1942, to March, 1943; that he feared the corporation would not have any stock on hand to supply its trade; that he discovered the later product of Stutzman had brownish streaks in it similar to amber and a white sediment, which made it difficult to sell; that he wrote to the Davies-Young Soap Company in Dayton, Ohio, asking if it could manufacture a satisfactory cleaner with sixteen parts of water to one part of soap; that the Davies-Young Soap Company replied that it could; that in February or March, 1943, he told Stutzman if he could not produce his cleaner as it originally was and make de-

livery, he would have to seek a new source of supply; and that Stutzman told him he was unable to secure the necessary compounds to bring his product up to standard, and could not make the required deliveries.

On April 23, 1943, the corporation placed its first order for a cleaner fluid with the Davies-Young Soap Company. Nash said this order was not intended as a permanent proposition, but simply to supplement Stutzman's failing deliveries; that thereafter he did not order from Stutzman because the latter had told him he could not deliver; and that he sold the product which he bought from Davies-Young Soap Company under the tradename of "16 to 1", and thought it superior to that manufactured by Stutzman.

Three other witnesses, employees of the corporation, testified that Stutzman told them in 1942 that he could not make further deliveries of his cleaner because he could not get the necessary materials for it. Another witness said Stutzman told him that the color of the fluid had changed because he had to leave out some of the original ingredients of his formula.

Stutzman admitted that he was unable, in 1942, to obtain an original ingredient of his cleaner, a 40% liquid soap, and that he eventually obtained a brand of concentrated castile soap, a 30% soap solution, without glycerine content, which he used in place of the liquid soap. He admitted that he did not advise the corporation that he had changed the formula, or that the substitute cost three cents per gallon less.

There is evidence tending to show that the substituted soap was not as good as the 40% liquid soap, although Stutzman testified to the contrary. Stutzman also denied that he had told the representatives of the corporation that he was unable to make deliveries of his product.

The uncontradicted evidence is that Stutzman never sold any of his product under the name of "16 to 1", or to any one other than Nash, before or after the contract of 1939. He had no established business to which the name of "16 to 1" was appurtenant. He had only used the fluid himself

to clean floors. Prior to contacting Nash, he had no market for the cleaner. Neither the product nor the name had any commercial value. "16 to 1" was not used as a trade or business mark until the corporation used it.

The courts are unanimous in holding that there is no property in a trade-mark; hence there can be no property right in a name which has never been used in the trade or business, and never registered. In *United Drug Co. v. Rectanus Co.*, 248 U. S. 90, 97, 39 S. Ct. 48, 63 L. Ed. 141, this is said:

"There is no such thing as property in a trade-mark except as a right appurtenant to an established business or trade in connection with which the mark is employed. The law of trade-marks is but a part of the broader law of unfair competition; the right to a particular mark grows out of its use, not its mere adoption; its function is simply to designate the goods as the product of a particular trader and to protect his good will against the sale of another's product as his; and it is not the subject of property except in connection with an existing business. *Hanover Star Milling Co. v. Metcalf*, 240 U. S. 403, 412-414, 36 S. Ct. 357, 60 L. Ed. 713, 717-719."

In *A. I. M. Percolating Corp. v. Ferrodine Chemical Corp.*, 139 Va. 366, 377, 124 S. E. 442, we said: "The right (to a trade-mark) grows out of use, not mere adoption," citing *Trade-Mark Cases*, 100 U. S. 82, 25 L. Ed. 550.

Thus, previous to use and registration the trade-mark "16 to 1" did not belong to Stutzman. Without use it did not constitute a property right.

As to the written contract, it will be observed that there is nothing said as to the time during which it should continue. There is nothing in the circumstances to determine its duration. Either party was, therefore, at liberty to terminate it at will, on giving reasonable notice of the intention to do so. *Stonega Coal, etc., Co. v. Louisville, etc., R. Co.*, 106 Va. 223, 226, 55 S. E. 551, 9 L. R. A. (N. S.) 1184.

The contract provided that the corporation was to have the exclusive sale and distribution of the cleaner, not

that the complainants were to be the sole manufacturers of any product which the corporation might sell under the name of "16 to 1". It does not provide that the corporation should purchase everything they sold under the name of "16 to 1" from Stutzman. It required, at most, during the time it was in effect, that the corporation purchase not less than fifty gallons per year at a fixed price, spend not less than $50 a year for advertising, and pay a royalty upon the "death or incapacity" of Stutzman to manufacture the material, providing Stutzman turned over to the corporation the formula. The formula was never given to C. A. Nash & Son, Inc., in indication of the "incapacity" of Stutzman to manufacture the cleaner.

Upon the cross-examination of Nash, it was brought out that his definition of the "incapacity" of Stutzman was the "physical inability" of Stutzman "on account of illness". No different interpretation was offered by any one.

The record discloses that both Stutzman and W. H. Nash have excellent reputations for truth and veracity. The burden, however, was on the complainants to prove the allegations of the complaint by a preponderance of the evidence. We agree with the learned trial chancellor that they failed so to do.

In summation it may be said, in support of the finding of the chancellor, that there was evidence which showed that Stutzman was unable to make deliveries ordered by the corporation that he did not furnish the grade of cleaner contracted for because of his inability to secure the proper ingredients; that he failed to advise the corporation of the substitution of inferior ingredients; that the trade-mark "16 to 1" had not been used by Stutzman in any trade or business conducted or established by him; and that Stutzman had full knowledge that the cleaner was known and marketed as a product of the corporation for more than two and one-half years before he brought this proceeding.

For the foregoing reasons, we are of opinion to affirm the decree of the trial court.

*Affirmed.*